IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SYLVIA LOPERENA, | § | |
|     Plaintiff | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. _____ |
| | § | JURY |
| ALEJANDRO MAYORKAS, SECRETARY, | § | |
| DEPARTMENT OF HOMELAND SECURITY | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Plaintiff SYLVIA LOPERENA (hereinafter sometimes referred to as either "LOPERENA" or "Plaintiff"), by and through her attorney of record, and files this Original Complaint which complains of Defendant, Alejandro Mayorkas, Secretary, Department of Homeland Security (hereinafter sometimes referred to as "the Agency") and for cause of action would show unto the Court the following:

### JURISDICTION and VENUE

1.1  This action is brought to recover damages and redress deprivations of rights secured to Plaintiff under Title VII of the Civil Rights Acts of 1964, as amended, 42 U.S.C. §2000(e) et. seq., for discrimination based on race, national origin, and gender hostile environment and retaliation for filing an EEO complaint.

1.2  The jurisdiction of the Court over this controversy is based upon statutory authority granted to this Court pursuant to 42 USC §2000e-16 (c) of Title VII of the Civil Rights Act of 1964, as amended.

1.3  Plaintiff has fully complied with the prerequisites to jurisdiction of this court. Plaintiff

received the notice of final action by the Agency regarding her discrimination and retaliation claims pursuant to Title VII and now files and seeks relief thereunder within ninety (90) days of receipt of said notice.

1.4     Plaintiff has fully complied with the prerequisites to jurisdiction of this court.

1.5     Venue is proper in this Court as the Defendant maintains offices throughout this District and Division.  Title VII grants to the Plaintiff the right to file in any court within the District where the acts of discrimination occurred.

## PARTIES

2.1     Plaintiff is an individual residing in the Southern District of Texas and at all times relevant hereto was an employee and/or person to whom such laws provide protection.

2.2     Defendant, Alejandro Mayorkas, is the Secretary of the United States Department of Homeland Security, which maintains detention and deportation facilities throughout the Southern District of Texas.

## GENERAL FACTS

3.1     Plaintiff is employed by the United States Department of Homeland Security (DHS) as a Supervisory Detention and Deportation Officer (SDDO) assigned to Harlingen Resident Office, which is a sub-office of the San Antonio field office of Enforcement and Removal Operations of ICE, a component of DHS.

3.2     Plaintiff began her employment with the federal service on or about October 27, 2002.

3.3     Plaintiff is a female who's national origin is Hispanic/Mexican American.

3.4     The eight-hour shifts at PIDC are 6:00 a.m. to 2:00 p.m. ("day" shift), 2:00 p.m. to 10:00 p.m. ("swing" shift), and 10:00 p.m. to 6:00 a.m. ("midnight" shift).

3.5     At the time of the events in question, approximately 11 SDDOs were employed by

PIDC of which two were female, Plaintiff and SDDO Rafaela Gonzalez.

## FACTUAL ALLEGATIONS

4.1   On July 7, 2014, Plaintiff filed a prior EEO complaint naming SDDO Homer Salinas as the person who's actions were in issue.

4.2   From the actions complained of herein, it is clear that Homer Salinas had a pretext for carrying out his actions against Plaintiff in retaliation for her filing a EEO complaint against him.

4.3   Assistant Field Office Director (AFOD) Janie Bennett was the direct supervisor of Plaintiff.  AFOD Homer Salinas told AFOD Bennett that if he received the Officer in Charge (OIC) position, he wanted Plaintiff moved out the office because it was too big for her and she didn't deserve it.  AFOD Bennett explained to AFOD Salinas that Plaintiff was in Building 2 with her unit and it was working well.

4.4   AFOD Homer Salinas was promoted to Officer in Charge (OIC) on or about September of 2017.

4.5   The following are incidents of unwelcome harassment and a hostile work environment that Plaintiff complained of to the Agency that compelled her to initiate her EEO complaint and eventually to initiate this lawsuit (Homer Salinas is referred to as "AFOD Salinas" when his position is known to have been an Assistant Field Office Director; Homer Salinas is referred to as "OIC Salinas" when his position is known to have changed to Officer in Charge):

(1)   On August 08, 2017 during a supervisor meeting AFOD Salinas referred to a family that came to ask about their family member as a "stupid Mexican family." Plaintiff felt offended because he was looking directly toward where she was sitting; as though he was

calling her a "stupid Mexican" to her face.

(2)  From the beginning of September 2017 through November 2017, Homer Salinas repeatedly made statements insinuating that Plaintiff and her co-worker, SDDO Carlos Tapia were having a romantic relationship as follows:

(a) On or about September 1, 2017, AFOD Salinas was looking for SDDO Tapia and he ran into Enforcement Removal Assistant (ERA) Frank Salazar and asked ERA Salazar what was going on between SDDO Tapia and Plaintiff when there was no justifiable reason to even make that insinuation;

(b) On or about September 5, 2017, AFOD Salinas questions SDDO Tapia why he was spending too much time with Plaintiff; again with no basis to ask such a question;

(c) On or about September 5, 2017, AFOD Salinas tells SDDO Tapia that he should move the Deportation Officer (DO) that sits next to Plaintiff's office to another office so that SDDO Tapia could be next to Plaintiff; said statement was totally unprofessional and was meant to harass Plaintiff;

(d) On or about September 6, 2017, AFOD Salinas sent an email to all SDDOs stating that Plaintiff and SDDO Tapia were AWL (AWOL).  Plaintiff was at the firearms range qualifying and OIC Salinas should have known.  SDDO Tapia clarifies that he was in the PIDC and cell phone service is not strong in the detention center.  Plaintiff confronted AFOD Salinas to stop spreading rumors and he didn't deny spreading rumors, he merely stated "well you guys are always together and I was just mad."  Plaintiff made AFOD Salinas aware that the comments were not welcome and needed to stop immediately;

(e)  On or about September 14, 2017, DO Hector Benavidez publicly insinuated SDDO Tapia and Plaintiff were having a romantic relationship and personally told SDDO

Tapia to leave it alone because she was "not going to give it up." DO Benavidez admitted that he heard from ERA Frank Salazar that AFOD Salinas making comments that SDDO Tapia and Plaintiff had something going on. By this time the rumors initiated by AFOD Salinas had gotten out of control and no one was doing anything to stop the rumors.

(f) On or about September 20, 2017, during a Supervisor meeting, Plaintiff voiced her opinion that she was concerned that Salinas has meetings with some SDDOs about other units without members of the other units being present. OIC Salinas responded by joking that SDDO Tapia had told her about those meetings "since he is always with you and tells you everything." This event took place in front of SDDOs William Oestreich, Rafaela Gonzalez, George Crum, Oscar Tapia, and Jerado Martinez. Again, Plaintiff told OIC Salinas to stop insinuating that SDDO Tapia and her had something going on. OIC Salinas merely responded by telling her to get over the moving out of Building 2 issues. Furthermore, OIC Salinas said he was the officer in charge and that he could do whatever changes he wanted.

(g) On or about September 21, 2017, DO Benavidez told DO Lorenzo Moran that he heard from ERA Frank Salazar that OIC Salinas made comments that SDDO Tapia and Plaintiff had something going on.

(3) On September 7, 2017, AFOD Salinas asked Plaintiff's male subordinate employees, "how does it feel to work for a female supervisor?" Then, he followed up on the questions specifically asking "how do you feel working under Loperena's supervision?" AFOD Salinas was creating a hostile environment by only asking the subordinates of Plaintiff if they liked working for a female supervisor, namely the Plaintiff.

Similarly, on or about September 16, 2017, AFOD Salinas went to Building 2 and

questioned DOs Everardo Prado, Lorenzo Moran and Roberto Limon how they liked working in Plaintiff's unit. He also asked them if she had asked them if they wanted to volunteer to work a transfer flight scheduled for Sunday, September 17, 2017.

(4) Beginning in mid-September 2017 to the end of November 2017, AFOD Salinas continuously monitored and micromanaged Plaintiff.

On or about October 3, 2017, Plaintiff received an email from OIC Salinas asking her for a daily schedule of her hours. She was instructed to inform him of her work schedule in advance; no other SDDOs were required to do this. In addition, OIC Salinas instructed her to let him know where, why and when she would be out of the camp and he would call to check if she was actually where she said she would be. Also, OIC Salinas would frequently stop by her office to see who was with her in her office and see what she was doing; again, no other SDDOs were experiencing this type of scrutiny.

(5) On September 15, 2017, a week after Plaintiff informed AFOD Salinas to stop insinuating that she was engaged in a romantic relationship with her co-worker, OIC Salinas transferred her to work in another office building. Specifically, Plaintiff was told to move her office to Building 1, in the Senior's officers area of the 1st floor. No other SDDO had offices there, all other SDDOs had their offices in 1st and 2nd floor in Building 1, in the DOS officers' area.

(a) On or about September 16, 2017, SDDO Rafaela Gonzalez was teasing her publicly in front of AFOD Bennett because of the email that OIC Salinas had sent where she was instructed to move to Building 1. OIC Salinas did not harass SDDO Rafaela Gonzalez because SDDO Rafaela Gonzalez was submissive to OIC Salinas. SDDO Rafaela Gonzalez took food to work that she prepared at her home, she would serve OIC Salinas

during lunch breaks, she would pick up his plate, and wash his dishes after she served him and he finished eating. SDDO Rafaela Salinas was even allowed to cook during working hours.

(b) On or about September 18, 2017, at around 1030 hours, Plaintiff was made aware that OIC Salinas went to the DOS offices and publicly told SDDO Tapia and SDDO George Crum to advise Plaintiff to move her office down to the DOS area and stated "SDDO Tapia, Loperena can move with you to your office if that makes her happy." At around 1430 hours ERA Salazar told Plaintiff that OIC Salinas told him Plaintiff was going to move her office down to where Tapia's office was. On the same day, at around 1505 hours, OIC Salinas sent her an email stating "let me make myself clear, you are to move into an office at the SDDO area." The following day, on September 19, 2017, OIC Salinas approached her outside the elevators and with a smirk tells her he had renamed the DOS offices as the Seniors offices. The following day, on September 20, 2017 at around 0700 hours, OIC Salinas went to Building 2 to ensure Plaintiff had cleared out her office while she was with her Unit. OIC Salinas mocked her and said he had made up his mind not to use her office after all and stated now you have to walk to Building 2 every day and stated "oh well that's part of your job." Clearly, OIC Salinas was using the moving of offices as a way to embarrass Plaintiff, and mock her in front of her Unit by rubbing it in that he wasn't going to use her office after all. Also, OIC Salinas using language like "let me make myself perfectly clear," is language used to intimidate and talk down to an SDDO.

(6) On Sept 29, 2017, OIC Salinas prohibited Plaintiff from entering the building that she previously worked in, and reassigned her to supervise a different unit, on a different shift. This was a clear example of intimidation and the harassment complained of affecting

a term, condition, or privilege of employment. On September 29, 2017 at 3:33 p.m. Plaintiff emails OIC Homer Salinas asking him how she can be expelled from Building 2 if the Unit that she manages is assigned to Building 2. An hour and forty minutes later at 5:13 p.m., OIC Homer Salinas sends out an email reassigning Plaintiff to another unit (from Flight line/Transportation/Transfers) to Detention Swings. By OIC Salinas prohibiting only Plaintiff and SDDO Tapia from going to Building 2 was embarrassing, intimidating, and clearly affecting a term, condition, or privilege of employment. Building 1 did not have the same amenities as Building 2. First, Building 1 did not have a Mail Room or a Detainee Mail Room. Also, the break room in Building 2 sat twice the amount of people of that in Building 1. No one other than Plaintiff and SDDO Tapia were expelled from Building 2. Plaintiff was not allowed to go into Building 2 all the way untill she transferred to the Harlingen Resident Office on September 2, 2018.

(7) In October of 2017, Plaintiff was subjected to different terms and conditions of employment than similarly situated co-workers with respect to the schedule of her hours.

(a) On or about October 20, 2017, OIC Salinas said Plaintiff was complaining of not having another SDDO on swing shift and someone needed to "bite the bullet" and volunteer. Since there were no volunteers, OIC Salinas failed to assign anyone to swings and left Plaintiff to manage swings by herself. All SDDOs were allowed to stay in their current units or were granted new assignments based on what they wanted except Plaintiff. OIC Salinas stated "I went as far to allow them to choose where they wanted to work. A few asked the rest blew me off." Prior to her taking swings, there were always two SDDOs assigned to swings. Again, Plaintiff was being treated differently that previous SDDOs who

worked the swing shift because she did not have anyone to cover her in the event she needed to take leave.

(b)  Detentions Swings was an undesirable shift.  On or about October 17, 2017, SDDO Martinez stopped by just to visit because he was afraid of also being sent to work Detention Swings if he was seen associating with her.  OIC Salinas had created such a hostile environment for Plaintiff, that it was obvious to other SDDOs that chose not to be caught associating with her out of fear of retaliation by OIC Salinas.

(c)  On or about October 27, 2017, Plaintiff was contacted by a security officer who commented that she asked for help because she couldn't handle the work load and how staff didn't want to be seen with her because of fear of retaliation from upper management.

(d) On or about Oct 30, 2017, Assistant Officer In Charge (AOIC) Rafaela Gonzalez told her that Salinas stated he was not going to assign another SDDO to Swings anymore.  Plaintiff worked the swings shift by herself from October 1, 2017 through February 26, 2018 when the new and permanent AOIC, Jose Longoria, transferred her out of Swings.

4.6    Plaintiff first contacted the Agency's Office of Diversity and Civil Rights on September 19, 2017 complaining of harassment based on sex, national origin, and retaliation for prior EEOC activity.  The Agency did nothing to protect the rights of the Plaintiff; any investigation initiated by the Agency completely stopped for no justifiable reason.  Somewhere between April 15, 2019 and July 8, 2019, the Agency conducted a Management Inquiry which was way too late to protect the rights of the Plaintiff.  Almost two years after the initial complaint was far too late for having any impact on helping Plaintiff with her complaints, especially

since OIC Salinas, the harasser, had retired from the Agency.

## COUNT ONE
### (RACIAL, NATIONAL ORIGIN and GENDER DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 USC 2000e. et. seq.)

5.1   The foregoing paragraphs are realleged and incorporated by reference herein.

5.2   Defendant discriminated against the Plaintiff due to her race, national origin and/or gender.  The Defendant's actions were severe and pervasive enough to alter the terms and conditions of employment.  The foregoing pervasive practices and conduct of Defendant as set forth above, constitutes race, national origin and/or gender discrimination towards Plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended.

5.3   The Defendant's conduct as alleged at length herein constitutes discrimination based on race, national origin and/or gender in violation of Title VII.  The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide Defendant's discriminatory animus.

5.4   As the result of Defendant's direct conduct as set forth above, Plaintiff suffered compensatory damages for which she seeks redress.

5.5   Defendant's conduct has resulted in Plaintiff suffering non-economic damages in the form of mental anguish and other compensatory damages due to the discrimination to be determined at trial.

5.6   Defendant's conduct toward Plaintiff was intentional and willful and of the nature for which Plaintiff is entitled to recover compensatory damages in an amount to be determined at trial.

5.7   Plaintiff is also entitled to recover her reasonable and necessary attorney's fees and expert fees and the costs of this action in an amount to be determined at trial.

## COUNT TWO
## (RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY)

6.1     The foregoing paragraphs are realleged and incorporated by reference herein.

6.2     Defendant discriminated and retaliated against the Plaintiff due to her engaging in a protected activity.  The Defendant's actions were severe and pervasive enough to alter the terms and conditions of employment.  The foregoing pervasive practices and conduct of Defendant as set forth above, constitutes retaliation against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended.

6.3     The Defendant's conduct as alleged above constitutes retaliation against the Plaintiff because she engaged in activities protected by Title VII.  The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's retaliatory animus.

6.4     As the result of Defendant's direct conduct as set forth above, Plaintiff suffered compensatory damages for which she seeks redress.

6.5     Defendant's conduct has resulted in Plaintiff suffering non-economic damages in the form of mental anguish and other compensatory damages due to the discrimination to be determined at trial.

6.6     Defendant's conduct toward Plaintiff was intentional and willful and of the nature for which Plaintiff is entitled to recover compensatory damages in an amount to be determined at trial.

6.7     Plaintiff is also entitled to recover her reasonable and necessary attorney's fees and expert fees and the costs of this action in an amount to be determined at trial.

## COUNT THREE
### (HOSTILE AND ABUSIVE WORKING ENVIRONMENT)

7.1   The foregoing paragraphs are realleged and incorporated by reference herein.

7.2   The Defendant's conduct as alleged above constitutes hostile and abusive working environment in violation of Title VII.  The Defendant's actions were severe and pervasive enough to alter the terms and conditions of employment.  The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's discriminatory animus.

7.3   As the result of Defendant's direct conduct as set forth above, Plaintiff suffered compensatory damages for which she seeks redress.

7.4   Defendant's conduct has resulted in Plaintiff suffering non-economic damages in the form of mental anguish and other compensatory damages due to the discrimination to be determined at trial.

7.5   Defendant's conduct toward Plaintiff was intentional and willful and of the nature for which Plaintiff is entitled to recover compensatory damages in an amount to be determined at trial.

7.6   Plaintiff is also entitled to recover her reasonable and necessary attorney's fees and expert fees and the costs of this action in an amount to be determined at trial.

## JURY DEMAND

8.1   Plaintiff herein demands a trial by a jury; a jury trial.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, for the foregoing reasons Plaintiff respectfully requests that this Court enter judgment against the Defendant as follows:

(a) That this Court award Plaintiff her non-economic damages in the form of mental anguish in an amount to be determined at trail;

(b) That this Court award Plaintiff compensatory and equitable damages for Defendant's illegal conduct in an amount to be determined at trial;

(c) That this Court award Plaintiff other damages and further relief as deemed just;

(d) That this Court award Plaintiff her reasonable and necessary attorney's and expert fees and the costs of this action in an amount to be determined at trial;

(e) That this Court award Plaintiff prejudgment interest at the maximum rate allowed by law;

(f) That this Court award Plaintiff post judgment interest at the legal rate;

(g) That this Court award Plaintiff costs of court; and

(h) That this Court award Plaintiff any other and further relief as she may be justly entitled to receive at law or in equity.

Respectfully submitted,

THE LAW FIRM OF ZAYAS & HERNANDEZ, PC
950 E. Van Buren St.
Brownsville, Texas  78520
Telephone:  (956)546-5060
Telecopier:  (956)546-5067
e-mail: lawfirm3100@yahoo.com

By: _____
RICHARD E. ZAYAS
State Bar No.:  00788744
Federal Bar No.: 16825
*Attorney for Plaintiff*