United States District Court
Southern District of Texas
**ENTERED**
October 16, 2023
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| SYLVIA LOPERENA, | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. 1:21-cv-59 |
| | § | |
| ALEJANDRO MAYORKAS, Secretary, | § | |
| Department of Homeland Security | § | |
| Defendant | § | |

**MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

Before the Court is Defendant Alejandro Mayorkas, Secretary of the United States Department of Homeland Security's Motion for Summary Judgment (hereinafter, Defendant's "Motion"). Dkt. No. 41. For the reasons provided below, it is recommended that the Court **GRANT** Defendant's Motion and **CLOSE** this civil action.

## I.     Jurisdiction

The Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331.

## II.     Background

Plaintiff Sylvia Loperena joined the federal service in October 2002 and, when she filed this action, was a supervisory detention and deportation officer ("SDDO") with Immigration and Customs Enforcement ("ICE"), an agency under the United States Department of Homeland Security ("DHS"), at the Port Isabel Detention Center ("PIDC"). Dkt. No. 1 at 2. Loperena's Complaint asserts claims against Defendant under Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. §§ 2000e–2000e-17 (hereinafter, "Title VII" or "the Act"). Loperena is a Hispanic (Mexican-American) woman who claims that her

former first level supervisor, Officer in Charge Homer Salinas, violated her civil rights under the Act by: (1) discriminating against her based upon her sex, race and national origin; (2) retaliating against her for engaging in activity that is protected under the Act; and (3) forcing her to endure a hostile work environment. *Id.* at 3, 10-12. Among other things, she seeks various types of pecuniary and nonpecuniary damages, attorney's fees, and court costs. *Id.* at 12-13.

On June 23, 2023, Defendant moved for summary judgment on all of Loperena's claims. Dkt. No. 41. Loperena filed her response (hereinafter, Loperena's "Response") on July 31, 2023. Dkt. No. 53. Defendant's Motion is now ripe for consideration.

### III.   Summary Judgment Standard

The standard applied when ruling on a motion for summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure. FED. R. CIV. P. 56(a). In pertinent part, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (cleaned up). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying the evidence in the record "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view "the evidence in the light most favorable to the non-moving party, drawing all justifiable inferences . . . in the non-movant's favor." *Renwick*, 901 F.3d at 611 (cleaned up).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to defeat the motion. *Celotex Corp.*, 477 U.S. at 322. Parties "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

## IV.    Discussion[1]

Loperena alleges that between August and November 2017, she was subjected to multiple instances of unlawful discrimination. *See generally* Dkt. No. 1 at 1–13. She first asserts that during an SDDO meeting on August 8, 2017,[2] a family came to PIDC to ask about the status of one of their detained family members. *Id.* at 3. While informing the SDDOs of the family's presence at the facility, Salinas "referred to [the] family . . . as a 'stupid Mexican family.'" *Id.* at 3–4. Loperena states that Salinas looked "directly toward where she was sitting" when he made that comment, "as though he was calling her a 'stupid Mexican' to her face." *Id.*

Much of Loperena's Complaint concerns repeated statements by Salinas "insinuating that Loperena and her co-worker, SDDO Carlos Tapia[,] were having a romantic relationship." *Id.* at 4. On September 1, Salinas asked another ICE employee

---

[1] The facts are drawn from Loperena's Complaint, Defendant's Motion and attachments, and Loperena's Response and attachments. The attachments include, *inter alia*, internal ICE emails, deposition excerpts from Loperena and her ICE colleagues taken in 2023 in relation to this case, and a Report of Investigation ("ROI") stemming from an investigation into Loperena's employment complaint to ICE's Joint Intake Center.

[2] Unless stated otherwise, all dates listed in this section occurred in the year 2017.

"what was going on between SDDO Tapia and [Loperena]." *Id.* Four days later, Salinas asked Tapia why he and Loperena were spending so much time together. *Id.* Salinas told Tapia that, if he desired, he could move his office next to Loperena's to be closer to her. *Id.* On September 6, Salinas tried to contact Tapia and Loperena, but neither answered. *Id.* Salinas emailed all the SDDOs noting that Loperena and Tapia were away without leave ("AWOL") and informed the SDDOs that they must be close to their phones to answer when Salinas calls. *Id.* Loperena could not be reached because she was training at the PIDC firearms range; Tapia could not be reached due to poor cell phone service. *Id.* Loperena confronted Salinas about the AWOL email on September 6, told Salinas to stop spreading rumors about her and Tapia, and stated that further comments were unwelcome. *Id.* Salinas responded, that the two were "always together[,] and [he] was just mad." *Id.* On September 14 and 21, Loperena learned that fellow SDDOs had heard rumors that she and Tapia were having a romantic relationship. *Id.* at 4–5. On September 20, during an SDDO meeting, Loperena asked Salinas not to hold meetings concerning the unit she supervised when she was not present. *Id.* at 5. Salinas responded that he believed Tapia probably told her about what was discussed in the meetings "since he [wa]s always with [her] and tells [her] everything." *Id.*

Loperena states that on September 7, Salinas asked Enforcement Removal Assistant Frank Salazar about how he felt working for a female supervisor—and specifically, Loperena. *Id.*

Loperena contends that beginning in early September 2017, Salinas began micromanaging her. *Id.* at 6. She states that no other SDDO was treated in that fashion. *Id.* Loperena alleges that on October 3, Salinas emailed her and asked her to provide him with a daily schedule of her hours. *Id.* According to Loperena, Salinas also instructed her

to "let him know where, why[,] and when she would be out of the [office] and he would call to check if she was actually where she said she would be." *Id.* Salinas would often walk by Loperena's office to check to see if she was there and, if so, with whom. *Id.* Even though the record includes emails from Salinas to all the SDDOs informing them that they were "to send an email daily" recording their whereabouts, Dkt. No. 41 at 16, the SDDOs deposed in this case stated they were not required to similarly inform Salinas of their every action. Dkt. No. 53 at 7–8.

Loperena alleges that Salinas acted unlawfully when he made her move her office and banned her from entering one of the buildings at PIDC. Dkt. No. 1 at 6–7. On September 15, Salinas emailed the SDDOs informing them that they must all maintain their offices in PIDC Building One. Dkt. No. 41 at 16. SDDOs supervising certain units would maintain offices on the second floor of Building One while those supervising other units would do so on the first floor. *Id.* Only Loperena and SDDO Raul Aguilar were affected by the policy change because, at the time, Loperena had her office in Building Two, and Aguilar had to move his office from the second floor to the first floor of Building One. Dkt. Nos. 1 at 6; 41 at 16–17. On September 18, Salinas told Tapia that he should advise Loperena to move to Building One, and if Tapia would like, that "Loperena can move with [him] to [his] office if that makes [Loperena] happy." Dkt. No. 1 at 7. On September 20, Salinas allegedly mocked Loperena in front of her subordinates about her having to move her office. *Id.*

On September 29, Salinas barred Loperena and Tapia from entering Building Two. *Id.* at 7–8. Loperena states that Building Two housed her subordinates' offices. *Id.* at 8. Some SDDOs where perplexed by the ban because, in the past, the SDDOs supervising Loperena's unit maintained their office in Building Two. Dkt. No. 53-10 at 17–18. Salinas

stated that he prohibited Tapia and Loperena from going to Building Two because they "would park and stay in building two," and other ICE employees would often call him because they could not find Loperena or Tapia. Dkt. No. 41 at 18. Indeed, the witnesses interviewed in ICE's management inquiry confirmed that Loperena and Tapia spent a lot of time together. Dkt. No. 41 at 37. On October 1, Salinas reassigned Loperena to supervise a different unit, which was not housed in Building Two. *Id.* at 27–28.

Loperena claims that Salinas unlawfully changed her work shift. Dkt. No 1. at 8–9. On September 29, Salinas emailed the SDDOs stating that, effective October 1, they would be given new duties and assignments. Dkt. 41 at 17. SDDOs at PIDC are assigned to one of three eight-hour shifts: (1) the "day shift" from 6:00 a.m. to 2:00 p.m.; (2) the "swing shift" from 2:00 p.m. to 10:00 p.m.; and (3) the "midnight shift" from 10:00 p.m. to 6:00 a.m. Dkt. No. 1. at 2. Salinas reassigned Loperena to the swing shift from the day shift. *Id.* at 8. Loperena states that not only did Salinas change her schedule to the undesirable swing shift without her input, but he also made her manage the shift by herself. *Id.* In the past, two SDDOs were assigned to each swing shift. *Id.*; Dkt. No. 53-4 at 4. Loperena asserts that, unlike her, the other SDDOs were asked their shift preference. Dkt. Nos. 41 at 31; 53 at 12. While one SDDO confirmed during ICE's eventual equal employment opportunity ("EEO") investigation into Loperena's claims that Salinas offered him a particular shift, the other SDDOs interviewed stated that there were no formal rotations, and that Salinas would usually assign the SDDOs to shifts as he saw fit. Dkt. No. 41 at 31.

Unhappy with her new shift assignment, Loperena emailed Salinas on September 29 requesting a meeting with her Field Office Director and third level supervisor, Daniel Bible. Dkt. No. 41 at 17. Salinas forwarded Loperena's email to his first level supervisor, Deputy Field Office Director Deborah Achim, noting that Loperena was not satisfied with

her new shift assignment and wished to speak with Bible. *Id.* He told her that he, "went as far to allow [the SDDOs] to cho[o]se where they wanted to work. A few asked the rest blew me off. I placed everyone where I felt they would best perform." Dkt. Nos. 41 at 19; 53 at 12.

At a meeting around October 20, Salinas informed the SDDOs that somebody would have to "bite the bullet" and join the swing shift because the shift's workload was too much for Loperena to handle alone. Dkt. Nos. 1 at 8; 53 at 11–12. There were no volunteers. Dkt. Nos. 1 at 8; 53 at 11–12. Loperena asserts that she never stated that she needed assistance with her duties; instead, she "needed assistance with the shift in the event she needed to take leave" for chemotherapy treatment. Dkt. No. 53 at 12. In fact, according to Loperena, she submitted a request for leave to attend a medical appointment on October 16, but Salinas ignored it. *Id.* Loperena had to reschedule her appointment. *Id.*

On October 24, Salinas emailed the SDDOs to note that Tapia and another SDDO would join Loperena on the swing shift. Dkt. No. 52 at 51. Neither Tapia nor another SDDO joined the swing shift. Dkt. Nos. 41 at 21; 53 at 12. Loperena worked the swing shift by herself until her reassignment to the day shift on March 5, 2018. Dkt. Nos. 41 at 31–33; 53 at 12. Loperena states that on October 17, she learned that another SDDO was worried that he would be assigned to the swing shift if he was seen associating with her. Dkt. No. 1 at 9.

On October 25, Salinas issued Loperena's performance appraisal for Fiscal Year 2017, rating her as "achieved excellence," the highest available rating. Dkt. No. 41 at 20. On November 26, Salinas awarded Loperena a $2,265 performance bonus for her Fiscal Year 2017 performance. *Id.*

On September 19, as the alleged discriminatory events noted above transpired, Loperena contacted an ICE EEO counselor and complained that Salinas subjected her and a "co-worker" to a hostile work environment based on Salinas's rumormongering about her purported romantic relationship with Tapia. Dkt. Nos. 1 at 9; 41 at 12, 17. On October 1, Loperena emailed Bible requesting a meeting. Dkt. No. 41 at 18. On October 3, Bible informed Achim that she would be responsible for investigating Loperena's claim and determining what appropriate corrective action should be taken. Dkt. No. 41 at 18. On October 4, Achim assigned SDDO Rafaela Gonzalez as Acting Assistant Officer in Charge to supervise Loperena instead of Salinas. *Id.* at 19. On October 5, Achim traveled to PIDC to investigate Loperena's complaints. *Id.* On October 19, Bible issued an order that Salinas should have no contact with Loperena outside of group settings and SDDO meetings. *Id.* Loperena states that Salinas learned of her latest EEO activity as of an SDDO meeting in mid-October when "Salinas made it a point to inform all of" the SDDOs that "Achim had told him that he needed a buffer" between him and the SDDOs because people were complaining that he was creating a hostile work environment. Dkt. No. 53 at 12–13, 22.

Around October 12, Loperena filed a complaint raising her harassment allegations with ICE's Joint Intake Center, which prompted the opening of an internal management inquiry. Dkt. No. 41 at 20. Loperena filed a formal EEO complaint with ICE on December 25, raising the instances of alleged discrimination noted above. Dkt. No. 41 at 12. The EEO investigation concluded on April 12, 2019. Dkt. No. 53 at 19. Between April and July 2019, ICE's Office of Diversity and Civil Rights conducted the management inquiry and issued its ROI on July 8, 2019.[3] Dkt. No. 53 at 19. The ROI concluded that Loperena was not

---

[3] In its Motion, Defendant distinguishes the management inquiry and the EEO investigation as follows: "The EEO investigation focused on whether management's specific actions and motivations violated federal

subjected to any unlawful discrimination; it did, however, conclude that Salinas engaged in disruptive behavior. Dkt. No. 41 at 22.

This civil action ultimately followed, in which Loperena asserts that, due to or because of her race, sex, national origin, or prior protected activity, Salinas: (1) discriminated against her; (2) retaliated against her for filing an EEO complaint against him in July 2014; and (3) forced her to endure a hostile working environment. The Court addresses each claim in turn.

### (1)    Loperena's Disparate Treatment Discrimination Claim

In her Complaint, Loperena first raises a disparate treatment claim, asserting that Salinas discriminated against her based on her sex (female) and race and national origin (Hispanic/Mexican American). Dkt. No. 1 at 10. Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Because direct evidence of discrimination is rare, a Title VII plaintiff ordinarily proves her discrimination claims through circumstantial evidence. *Saketkoo v. Admins. of Tulane Educ. Fund*, 31 F.4th 990, 997 (5th Cir. 2022). In the absence of direct evidence of discrimination, the Court assesses Title VII discrimination claims following a three-step, burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). First, a Title VII plaintiff must establish a prima facie case of discrimination. *Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016)

---

EEO law, whereas the [management inquiry] of an employee looked more broadly at the implications of the particular incidents in conjunction with an examination of whether agency policy was violated." Dkt. No. 41 at 35.

(citing *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff meets that burden, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the alleged discriminatory actions. *Id.* "Finally, if the employer meets its burden, the presumption of discrimination drops out of the picture, and the employee must offer some evidence that the reason proffered was a pretext for discrimination, or that a motivating factor for the employment decision was the plaintiff's protected characteristic." *Id.* (cleaned up).

To establish a prima facie case of disparate treatment discrimination, an employee must provide evidence that:

> (1) [s]he is a member of a protected class, (2) [s]he was qualified for the position at issue, (3) [s]he was the subject of an adverse employment action, and (4) [s]he was treated less favorably because of [her] membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.

*Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009); *see also Harville v. City of Houston*, 945 F.3d 870, 875 (5th Cir. 2019).

Defendant dedicates a sizeable section of his Motion to address Loperena's disparate treatment claim. *See* Dkt. No. 41 at 14–22. Although she raises a disparate treatment claim in her Complaint, in her Response, Loperena argues only that she established a prima facie case of retaliation and a hostile work environment claim—she does not discuss her disparate treatment discrimination claim at all. Dkt. No. 53. Indeed, though her Complaint raises three claims, Loperena's Response states only that her "first claim is based on . . . hostile-work environment harassment," and her "second claim is based on . . . retaliation." *Id.* at 1. Because Loperena failed to respond to Defendant's Motion as to her disparate treatment claim, and because she does not list the claim in her Response, the Court finds that Loperena abandoned the claim. *See Criner v. Tex.–N.M. Power Co.*, 470 F. App'x 364, 367–68 (5th Cir. 2012) (concluding that plaintiff abandoned

her disparate treatment claims because she failed to defend them in response to defendant's motion for summary judgment and instead only raised her disparate impact claims); *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (concluding that plaintiff abandoned her claim by failing to pursue it beyond her complaint or to defend it in two responses to defendant's summary judgment motions); *see also Vela v. City of Houston*, 276 F.3d 659, 679 (5th Cir. 2001); *Scales v. Slater*, 181 F.3d 703, 708 n.5 (5th Cir. 1999); *Arias v. Wells Fargo Bank, N.A.*, No. 3:18-CV-00418-L, 2019 WL 2770160, at *2 (N.D. Tex. July 2, 2019) (Lindsay, J.); *Youngblood v. Noble Drilling LLC*, No. 4:18-CV-0112, 2019 WL 2503997, at *2 (S.D. Tex. May 15, 2019) (Bryan, M.J.), *adopted by*, No. 4:18-CV-112, 2019 WL 2501559 (S.D. Tex. June 17, 2019) (Gilmore, J.); *Seghers v. Hilti, Inc.*, No. 4:16-CV-00244, 2017 WL 4652443, at *6 (S.D. Tex. Oct. 17, 2017) (Atlas, J.).

Accordingly, Defendant is entitled to summary judgment with respect to Loperena's disparate treatment claim.

### (2)   Loperena's Retaliation Claim

Loperena next claims that after her prior EEO activity against Salinas, Salinas retaliated against her by ignoring her request for leave to attend a medical appointment on October 16, 2017. Dkt. Nos. 1 at 11; 53 at 21. Defendant argues that Loperena cannot establish her prima facie case of retaliation because the alleged retaliatory acts were not unlawful, any alleged retaliation happened over three years after Loperena's 2014 EEO complaint, and even if Loperena established a prima facie case of retaliation, she could not demonstrate that Salinas's legitimate, nondiscriminatory reasons for his actions are a pretext for retaliation. Dkt. No. 41 at 46–49.

Under Title VII, an employer may not discriminate against an employee because the employee "opposed any practice made an unlawful employment practice by" the Act, "or because [the employee] has made a charge . . . or participated in any manner in an investigation, proceeding, or hearing under" the Act. *See* 42 U.S.C. § 2000e-3(a). Retaliation claims are also subject to the McDonnell Douglas burden shifting framework. *Outley v. Luke & Assocs.*, 840 F.3d 212, 219 (5th Cir. 2016). To establish a prima facie case of retaliation, an employee must provide evidence that: (1) "she engaged in activity protected by Title VII"; (2) "the employer took adverse action against . . . her"; and (3) "a causal connection exists between the protected activity and the adverse action." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 826 (5th Cir. 2019) (citing *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015), *abrogated on other grounds by Hamilton v. Dallas County*, No. 21-10133, 2023 WL 5316716, at *1 (5th Cir. Aug. 18, 2023) (en banc)). To establish that an employer took a retaliatory adverse employment action, an employee "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* In determining whether an action is materially adverse, courts "look to indicia such as whether the action affected 'job title, grade, hours, salary, or benefits' or caused 'a diminution in prestige or change in standing among . . . coworkers.'" *Id.* (quoting *Paul v. Elayn Hunt Corr. Ctr.*, 666 F. App'x 342, 346 (5th Cir. 2016)).

To establish the causality element of a prima facie case of retaliation, "a plaintiff must demonstrate that the employer's decision was based in part on knowledge of the employee's protected activity." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 305 (5th Cir. 2020) (cleaned up). "A plaintiff alleging retaliation may satisfy the causal connection

element by showing close timing between an employee's protected activity and an adverse action against him." *Feist v. Louisiana*, 730 F.3d 450, 454 (5th Cir. 2013) (cleaned up). "Such temporal proximity must generally be 'very close.'" *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)). The Fifth Circuit has held that "a five month lapse is not close enough . . . to establish the causal connection element of a prima facie case of retaliation." *Newbury v. City of Windcrest*, 991 F.3d 672, 679 (5th Cir. 2021).

In her Complaint, Loperena asserts only that her July 2014 EEO complaint against Salinas constitutes the relevant "protected activity" underlying her retaliation claim here. Dkt. No. 1 at 3, 11. In her Response, Loperena substitutes two separate instances, noting that the purported protected activities occurred: (1) when, on September 6, 2017, she informed Salinas that continued rumors of a romantic relationship between her and Tapia were unwelcome; and (2) when she "fil[ed] an EEOC complaint against . . . Salinas in October 2017." Dkt. No. 53 at 21–22. The Court addresses all three alleged instances of protected activity.

Loperena engaged in protected activity by filing her July 2014 EEO complaint against Salinas. *See* 42 U.S.C. § 2000e-3(a). However, she cannot establish the causality element of her prima facie case based on the 2014 complaint. While it is likely that Salinas knew of her 2014 complaint, Loperena points to no summary judgment evidence establishing as much. *See Turner*, 476 F.3d at 343. Further, the earliest date of the alleged unlawful conduct in this case is August 8, 2017–over three years after her 2014 EEO complaint. Dkt. No. 1 at 3. If, without more, five months is too long of a period to establish the causality element of a retaliation claim, so too is three years. *See Newbury*, 991 F.3d at 679.

Loperena next asserts that her informing Salinas on September 19, 2017, that his

rumors about her and Tapia were unwelcome constitutes protected activity for purposes of her retaliation claim. Dkt. No. 53 at 21. This assertion also fails. The Fifth Circuit "has consistently held that a vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity." *Paske v. Fitzgerald*, 785 F.3d 977, 986 (5th Cir. 2015) (brackets omitted). Though Loperena is correct that "magic words are not required" to raise a protected complaint, the "protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue." *Brown v. United Parcel Serv., Inc.*, 406 F. App'x 837, 840 (5th Cir. 2010) (per curiam). "Title VII protects only opposition to discrimination based on 'race, color, religion, sex, or national origin.'" *Id.* In her statement to Salinas, Loperena made no reference to unlawful discrimination based on a protected characteristic, so it cannot form the basis for a retaliation claim.[4] *See id.* (concluding that plaintiff's complaint regarding "unfair work distribution, unpaid overtime, and selective enforcement of a lunch policy, without more" did not suffice to support a Title VII retaliation claim); *cf. Turner*, 476 F.3d at 348 (concluding that supervisor's statement regarding plaintiff's volunteer work with "ghetto children" was not itself an unlawful employment practice, and so, plaintiff's statement to her supervisor to "[p]lease refrain from making reference to [her] race" could not have been considered protected activity).

Loperena contends that she engaged in additional protected activity by "filing an EEOC complaint against [Salinas] in October of 2017." Dkt. No. 53 at 22. She does not specify to which EEO complaint in October 2017 she refers, but the Court assumes it is to

---

[4] In her hostile work environment claim, but not in her retaliation claim, Loperena asserts that Salinas's rumors were based on sex as they only existed "because [Loperena] and SDDO Tapia were of the opposite sex." Dkt. No. 53 at 14. The Court addresses—and rejects—that argument in Section IV(3), *infra*.

her October 12 complaint to ICE's Joint Intake Center. Dkt. No. 41 at 20. Such a complaint would constitute protected activity under Title VII. *See* 42 U.S.C. § 2000e-3(a). Loperena attempts to establish the causality element of her prima facie case of retaliation by noting that in an October 2017 SDDO meeting, Salinas mentioned that somebody had been filing EEO complaints about him. Dkt. No. 53 at 12–13. She asserts that "[t]his clearly shows . . . Salinas was aware of [her] filing an EEOC complaint against [him] in October of 2017. This is the same month that . . . Salinas failed to grant leave to [Loperena]." Dkt. No. 53 at 22. There is no evidence of the SDDO meeting's date, so there is no direct evidence whether Salinas knew of her complaint before he ignored her request for leave. *See Lyons*, 964 F.3d at 305. Nevertheless, Loperena filed her complaint on October 12, and Salinas purportedly ignored her request for leave four days later. The temporal proximity here suffices to establish the causation element of her prima facie case of retaliation. *Newbury*, 991 F.3d at 679; *Feist*, 730 F.3d at 454.

Critically, though, Loperena fails to establish the "adverse employment action" element of her prima facie case of retaliation. As noted, the only alleged adverse employment action she asserts as underlying her retaliation claim is Salinas's failure to respond to her request for leave for a medical appointment on October 16, 2017. Dkt. No. 53 at 12, 22. However, "the denial of one day of leave does not rise to the level of an adverse employment action." *Hart v. Life Care Ctr. of Plano*, 243 F. App'x 816, 818 (5th Cir. 2007) (per curiam); *see Ogden v. Potter*, 397 F. App'x 938, 939 (5th Cir. 2010) (per curiam) ("A single denial of leave is not an adverse employment action when it affects leave on a specific date and time, but not the employee's amount of or right to take leave in general, because a reasonable employee would not have found the action to be materially adverse."); *Morales v. Gotbaum*, 42 F. Supp. 3d 175, 207 (D.D.C. 2014) (Jackson, J.)

(concluding that the denial of one day of sick leave was not an adverse employment action and, even it were, the harm was *de minimis*); *Beltran v. Univ. of Tex. Health Sci. Ctr. at Hous.*, 837 F. Supp. 2d 635, 643 (S.D. Tex. 2011) (Miller, J.) ("The courts that have considered the issue have routinely found that the denial of short-term vacation time is not an adverse employment action."). Loperena does not argue that any other alleged unlawful employment action listed above underlies her retaliation claim; she cannot, then, establish her prima facie case of retaliation. *See Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (noting that, to overcome summary judgment, a plaintiff must "identify specific evidence in the record and . . . articulate the precise manner in which that evidence supports . . . her claim.").

Because Loperena has not presented a material question of fact with respect to each element of her prima facie case, Defendant is entitled to summary judgment as to Loperena's retaliation claim.

### (3)    Loperena's Hostile Work Environment Claim

In her final claim, Loperena alleges that Salinas subjected her to a hostile work environment. Dkt. No. 1 at 12. She incorporates all the abovementioned alleged instances of unlawful conduct into her claim, including: (1) Salinas's "stupid Mexican family" statement; (2) Salinas's rumors about Loperena's alleged romantic relationship with Tapia; (3) Salinas's micromanagement of Loperena; (4–5) Loperena's office and shift changes; and (6) Loperena's ban from PIDC Building Two. Dkt. No. 53 at 16–17. Defendant contends that Loperena cannot establish a case of a hostile work environment and, in any event, that he cannot be held vicariously liable for any of Salinas's alleged discrimination. Dkt. No. 41 at 23, 33–45.

"Title VII makes it unlawful for employers to require people to work in a discriminatorily hostile or abusive environment." *West*, 960 F.3d at 741. *West v. City of Houston*, 960 F.3d 736, 741 (5th Cir. 2020) (cleaned up). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" West, 960 F.3d at 741 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)). To establish a hostile work environment claim, an employee must demonstrate that: (1) she is a member of a protected group; (2) she was subjected to harassment; (3) the harassment was based on her protected class; (4) the harassment affected a term, condition, or privilege of her employment; and (5) her employer knew or should have known of the harassment and failed to take prompt remedial action. *Saketkoo*, 31 F.4th at 1003. "When a supervisor is the harasser, the employee need not establish the fifth element." *Wallace v. Performance Contractors, Inc.*, 57 F.4th 209, 221 (5th Cir. 2023).

"To affect a term, condition, or privilege of employment, the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *West*, 960 F.3d at 741–42 (quoting A*ryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 479 (5th Cir. 2008)). "[T]he work environment must be 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). To determine whether a work environment is objectively offensive, "courts consider the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes

with an employee's work performance." *E.E.O.C. v. WC&M Enterprises, Inc.*, 496 F.3d 393, 399 (5th Cir. 2007). Title VII is not a "general civility code," and does not prohibit "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788 (cleaned up). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id.* (internal citation omitted).

It is undisputed that Loperena is a member of a protected group, and that Salinas was her supervisor. After considering the parties' arguments and summary judgment evidence, the Court finds that Loperena has failed to establish the remaining elements of her hostile work environment claim.

Loperena fails to produce summary judgment evidence that the alleged harassment she faced was based on her protected class. *See Saketkoo*, 31 F.4th at 1003. In support of her assertion that the alleged harassment she faced was based on her sex, Loperena raises two arguments. First, citing no legal authority, Loperena contends that Salinas's rumors were based on sex as they only existed "because [Loperena] and SDDO Tapia were of the opposite sex," and "[n]owhere in the record is . . . Salinas complaining of other same sex friends of having a romantic relationship." Dkt. No. 53 at 14. Loperena's argument misses the mark. "The 'critical issue' in determining whether workplace activities constitute harassment based on sex is 'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Reine v. Honeywell Int'l Inc.*, 362 F. App'x 395, 397 (5th Cir. 2010) (per curiam) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). By Loperena's own admission, Salinas subjected Tapia to the same rumors as he did Loperena. Dkt. Nos. 41

at 17; 52 at 13. In fact, Loperena attached to her Response an EEO complaint filed by Tapia in which he raises the same harassment claim against Salinas as Loperena does here. Dkt. No. 53 at 4, 5, 14; *see Reine*, 362 F. App'x at 397 ("Testimony from numerous employees— male and female—demonstrates that Gautreau was an 'equal opportunity' harasser. When the conduct is equally harsh towards men and women, there is no hostile work environment based on sex." (citing *Butler v. Ysleta Indep. Sch. Dist.*, 161 F.3d 263, 270– 71 (5th Cir. 1998)). Further, Loperena does not explain how Salinas's rumors evidence that the remaining instances of alleged harassment were based on her sex. *See Daywalker v. Univ. of Tex. Med. Branch at Galveston*, 641 F. Supp. 3d 362, 376 (S.D. Tex. 2022) (Brown, J.) ("Importantly, it 'is not a sufficient basis to impute a similar racial intent to [the defendant's] separate, unrelated actions and infer that all the conduct was based on race.'" (quoting *Gibson v. Verizon Servs. Org., Inc.*, 498 F. App'x 391, 394 (5th Cir. 2012)). The Court finds that Salinas's rumors do not support Loperena's assertion that she was harassed based on her sex.

In her second argument, Loperena contends that the alleged harassment she faced was based on her sex because Salinas asked Salazar, her subordinate, about how he felt working for a female supervisor; specifically, Loperena. Dkt. No. 53 at 14. Again, Loperena provides no explanation or legal authority as to how this incident demonstrates that the alleged harassment she faced was based on her sex. *See Turner*, 476 F.3d at 343 (conclusory assertions do not suffice to satisfy burden to defeat summary judgment); *Daywalker*, 641 F. Supp. 3d at 376. Because she fails to raise a material question of fact to show that her alleged harassment was because of her sex, Loperena's hostile work environment claim cannot survive summary judgment. *See Saketkoo*, 31 F.4th at 1003.

For the sake of completeness, the Court will address the remaining elements of her hostile work environment claim.

The Court further finds that Loperena fails to produce summary judgment evidence that the alleged harassment she faced affected a term, condition, or privilege of her employment.[5] *See id.* First, she argues that Salinas's "stupid Mexican family" statement contributed to a hostile work environment. However, the comment was neither severe nor pervasive conduct, as it was an isolated incident and was not physically threatening or humiliating. *See WC&M Enterprises, Inc.*, 496 F.3d at 399. The comment did not mention Loperena at all, and it can be characterized as "the ordinary tribulations of the workplace" falling outside of Title VII's protections. *See Faragher*, 524 U.S. at 788; *Saketkoo*, 31 F.4th at 1004 (concluding that supervisor's sporadic yelling, mocking, and chastising of female employee was not severe or pervasive conduct); *Turner*, 476 F.3d at 348; *Buisson v. Bd. of Sup'rs of La. Cmty. & Tech. Coll. Sys.*, 592 F. App'x 237, 239 (5th Cir. 2014) (per curiam) (concluding that "one-time utterance" of a "bigoted term" directed at Asian-American employee could not support a hostile work environment claim," and collecting cases where severe and pervasive conduct supported a hostile work environment claim); *cf. Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 326–29 (5th Cir. 2004) (concluding that male coworker's conduct did not constitute harassment when he, among other things, "once slapped [plaintiff] on the behind with a newspaper," and "once held her cheeks and tried to kiss" plaintiff); *Shepherd v. Comptroller of Pub. Accounts of the State of Tex.*, 168 F.3d 871, 874 (5th Cir. 1999) (concluding that harassment was not actionable when a male coworker, among other things, commented on various parts of

---

[5] Notably, Loperena received the highest possible rating and a cash bonus for her Fiscal Year 2017 job performance. Dkt. No. 41 at 20.

the female plaintiff's body, twice patted his lap and informed the plaintiff to take a seat, and occasionally rubbed plaintiff's arm from shoulder to wrist). Salinas's comment, then, cannot support Loperena's hostile work environment claim.

As noted, Loperena also contends that Salinas's rumors about her and Tapia contributed to a hostile work environment. The Court finds they did not. Critically, Loperena fails to establish that the harassment she endured due to Salinas's rumors was based on her sex; the rumors also do not constitute actionable harassment. Loperena lists seven times over about a two-month period that the issue of her relationship with Tapia was raised. Dkt. No. 53 at 4–6. Though improper, the rumors are the type of sporadic offhand comments and occasional teasing that fall outside of Title VII's ambit. *See Faragher*, 524 U.S. at 788; *Turner*, 476 F.3d at 348. Additionally, only two of Salinas's comments were directed at least in part at Loperena: his September 6 email in which he states that Loperena and Tapia were AWOL; and his comment at the September 20, 2017 SDDO meeting that Loperena and Tapia were always together. Dkt. No. 53 at 4–5. Loperena only learned of Salinas's remaining comments from her coworkers. *See id.* "Such 'second-hand' harassment carries less evidentiary weight in a hostile work environment case than actions or remarks that are directed at the plaintiff herself." *Boutin v. Exxon Mobil Corp.*, 730 F. Supp. 2d 660, 671 (S.D. Tex. 2010) (Rosenthal, J.); *see Tolliver v. YRC, Inc.*, 729 F. App'x 332, 333 (5th Cir. 2018) (per curiam) ("Under our precedent, these events were not 'sufficiently severe or pervasive,' particularly where Plaintiffs did not contend that the acts were directed at them and for the most part learned about the acts secondhand."); *Johnson v. TCB Const. Co.*, 334 F. App'x 666, 671 (5th Cir. 2009) (per curiam) ("[A]lthough Johnson offers evidence of Turner's frequent use of the [n-word], these comments were not uttered in Johnson's presence nor is there evidence

that they affected his job. Johnson has therefore failed to offer enough evidence that he suffered from a racially hostile work environment under Title VII.").

Loperena next argues that Salinas's micromanagement created a hostile work environment. According to Loperena, Salinas instructed her to "let him know where, why[,] and when she would be out of the [office] and he would call to check if she was actually where she said she would be." Dkt. No. 1 at 6. Loperena further claims Salinas would walk by her office to check to see if she was there and, if so, with whom. *Id.* The summary judgment evidence shows that Salinas sent emails to the SDDOs informing them that they must all keep him apprised of their locations. Dkt. Nos. 41 at 16. However, each of the SDDOs testified that they were not micromanaged in the way described by Loperena. Dkt. No. 53 at 7–8. Assuming arguendo that Loperena was treated differently, "[g]enerally, heightened scrutiny of an employee by a supervisor is not harassment that can support a hostile work environment claim." *Robinson v. Paulson*, No. CIV.A. H-06-4083, 2008 WL 4692392, at *18 (S.D. Tex. Oct. 22, 2008) (Rosenthal, J.) (collecting cases); *Green v. Trimac Transp. S., Inc.*, No. 1:10-CV-444, 2012 WL 12893293, at *14 (E.D. Tex. Sept. 12, 2012) (Crone, J.), *aff'd sub nom. Green v. Trimac Transp., Inc.*, 546 F. App'x 333 (5th Cir. 2013) (per curiam); *see also O'Brien v. Dep't of Agric.*, 532 F.3d 805, 810 (8th Cir. 2008) (concluding that unspecific claims that defendant "interfered with [plaintiffs'] work on a daily to weekly basis; embarrassed, isolated, and ostracized them; closely scrutinized and criticized their work; and increased their workload" did not suffice to establish a hostile work environment claim); *cf. Martinelli v. Penn Millers Ins. Co.*, 269 F. App'x 226, 230 (3d Cir. 2008) ("[Defendant]'s scrutiny of [plaintiff]'s work, while unpleasant and annoying, did not create the sort of hostile work environment that

would satisfy Title VII's anti-retaliation provision."). Salinas's micromanagement does not support Loperena's claim.

Finally, Loperena also points to her shift change to the swing shift, office building move, and ban from PIDC Building Two as conduct contributing to a hostile work environment. Dkt. No. 53 at 8–13. These actions also fail to support her claim. First, each action constitutes an isolated incident that cannot be considered pervasive. *See WC&M Enterprises, Inc.*, 496 F.3d at 399; *West*, 960 F.3d at 742. This is especially true since these three actions were spread over a two- to three-week period. Second, Loperena offers no evidence that the changes were severe or physically threatening. *See WC&M Enterprises, Inc.*, 496 F.3d at 399. Although Salinas apparently mocked Loperena about having to move her office, it is not the type of severe conduct that Title VII protects against. *See Saketkoo*, 31 F.4th at 1004; *Septimus v. Univ. of Hous.*, 399 F.3d 601, 612 (5th Cir. 2005) (concluding that while "boorish and offensive," male supervisor's two-hour "harangue" of female plaintiff, which "frightened her and made her feel useless and incompetent," and questioning plaintiff in a mocking tone did not suffice to support a hostile work environment claim).[6]

As discussed above, the Court finds Loperena has failed to establish that the harassment she claims was based on her sex. Considering the totality of the circumstances, the Court further finds the alleged harassment Loperena faced between

---

[6] While these three actions might have supported a disparate treatment discrimination claim, they do not support Loperena's hostile work environment claim. *See Hamilton v. Dallas County*, No. 21-10133, 2023 WL 5316716, at *1 (5th Cir. Aug. 18, 2023) (en banc) (clarifying the "adverse employment action" standard in disparate treatment cases); *Robinson*, 2008 WL 4692392, at *20 ("[A]cts of disparate treatment cannot be transformed, without more, into a hostile work environment claim."); *Parker v. State of Del., Dep't of Pub. Safety*, 11 F. Supp. 2d 467, 475 (D. Del. 1998) (Schwartz, J.) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64–67 (1986)) (distinguishing between the type of harm addressed by a disparate treatment claim and a hostile work environment claim).

August and November 2017 is insufficient to meet the high bar to establish a hostile work environment claim. *See West*, 960 F.3d at 741. "This circuit requires far more." *Daywalker*, 641 F. Supp. 3d at 376; *see Hockman*, 407 F.3d at 326–29; *Shepherd*, 168 F.3d at 874. Because the Court finds that Loperena has failed to present a material question of fact with respect to each element of her hostile work environment claim, Defendant is entitled to summary judgment with respect to the claim.[7]

## V.    RECOMMENDATION

For the foregoing reasons, it is recommended that the Court **GRANT** Defendant's Motion and **CLOSE** this civil action.

## VI.    NOTICE TO PARTIES

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996).

**SIGNED** on this **16th** day of **October, 2023**, at Brownsville, Texas.

---

[7] Defendant also asserts that it cannot be vicariously liable for Salinas's discrimination under *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 746 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 780 (1998). Because Loperena has not established a case of a hostile work environment, the Court does not address Defendant's *Faragher/Ellerth* defense.

**Ignacio Torteya, III**
**United States Magistrate Judge**